**PERKINS COIE LLP**
Schuyler G. Carroll (*pro hac vice* pending)
Jeffrey D. Vanacore
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112-0085
Telephone:  212.262.6900
Email: scarroll@perkinscoie.com
       jvanacore@perkinscoie.com

*Proposed* Counsel to the Debtors

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

--------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Marine Environmental Remediation | ) | Case No. 19-18994-VFP |
| Group LLC and MER Group Puerto Rico | ) |  |
| LLC, | ) | Judge: Vincent F. Papalia |
|  | ) |  |
| Debtors.[1] | ) | (Joint Administration Requested) |

--------------------------------------------------------

**DECLARATION OF MARTIN VULAJ IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Martin Vulaj, make this declaration under 28 U.S.C. § 1746 (the "Declaration"):

1.     I am over the age of 18 and am authorized to submit this Declaration on behalf of Marine Environmental Remediation Group LLC and MER Group Puerto Rico LLC.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

---

[1] The last four digits of Debtor Marine Environmental Remediation Group LLC's federal tax identification number are 7870.  The last four digits of Debtor MER Group Puerto Rico LLC's federal tax identification number are 0508.  The mailing address for both Debtors is: 12 Hillcrest Road, Mountain Lakes, NJ 07046.

2.      I am the Chief Executive Officer ("CEO") of both Marine Environmental Remediation Group LLC ("MER"), a New Jersey limited liability company located in Mountain Lakes, New Jersey, and MER Group Puerto Rico LLC ("MER PR"), MER's wholly owned single-member subsidiary, which is a Puerto Rico limited liability company located in Ceiba, Puerto Rico (collectively, MER and MER PR are referred to herein as the "Debtors" or "MER").  I served in this role with the above-captioned Debtors and Debtors-in-Possession from December 2014 through August 2017 and then re-joined MER in this role in April 2019.  As to the matters testified to herein that occurred between August 2017 and April 2019, I have reviewed documents and interviewed persons with knowledge and am satisfied that my testimony is completely accurate.

3.      I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases"). Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors, or my opinion, which itself would be based on my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      Soon after I re-joined MER as the CEO, the Debtors also decided to appoint an independent director to allow the Debtors to engage in proper and disinterested decision making.  In this regard, on May 1, 2019, Anthony Sodono III

was appointed as a director of each of the Debtors.  The addition of Mr. Sodono to the leadership of the Debtors will ensure the Debtors can give full consideration to the interests of the estate, all creditors, and all other stakeholders.

5.      The Debtors are in the business of recycling obsolete and damaged ships in a manner that is both environmentally sound and health and safety conscious. On the date hereof, each Debtor commenced with this court a voluntary case under chapter 11 of title 11 of the United States Code.  The Debtors have commenced these cases to address current cash flow and liquidity issues, allow them to move past certain insurance disputes, and capitalize on many profitable business prospects.

6.      As described in further detail below, the Debtors' current circumstances and need to commence these cases arises primarily as a result of the arbitrary and bad faith actions of two different insurance carriers — both of whom agreed to provide coverage to the Debtors but refused to actually pay when the time came.  To make matters worse, Starr, one of the carriers commenced litigation against the Debtors after demanding that the Debtors provide a mortgage in favor of Starr to insure Starr would not suffer any losses.  It is difficult to understand why the Debtors should be forced to provide their own insurer with protection, which would seem to defeat the very reason that the Debtors bought insurance and paid significant premiums in the first place.

7.      As is obvious now, however, these actions were part of a plan that Starr developed and executed to ruin the Debtors so that Starr would not have to pay on the Debtors' insurance claim.  As a further part of Starr's plan, it forced the Debtors to work for Starr below the Debtors' own cost, and then actually refused to pay the

Debtors even that reduced rate.  The numerous improper actions of both carriers caused substantial harm to the Debtors, drained the Debtors of all financial resources and led to the current circumstances, in which the Debtors have been left with no alternative but to commence these cases.  It is primarily the actions of these two insurers that forced the Debtors into bankruptcy.

8.    The Declaration is organized in five (5) parts as follows:

- Section I provides information on my personal background;

- Section II describes the Debtors' business, both historical and its current operations, as well as the events leading to the Debtors' chapter 11 filing;

- Section III describes the Debtors' prepetition corporate and capital structure;

- Section IV summarizes the Debtors' plan for these Chapter 11 Cases;

- Section V sets forth the evidentiary basis for the relief requested in each of the First Day Motions

## I.
## Personal Background

9.    I have significant experience both as a leader and in the construction industry.

10.    I received my B.A. in Philosophy from Fairleigh Dickinson University in 1987 and my J.D. from Albany Law School in 1991.

11.    Over the course of the next 10 years, I established my own law practice which ultimately became the legal advisor to the Provisional Government of Kosovo.

12.    I left the private practice of law in 2002 and became the Executive Director of the National Albanian American Council ("NAAC") in Washington, DC,

where I interacted with staff members of the White House, Congress, and the State Department on various issues involving the Balkans, including democratic development, civil society, minority issues, corruption, human trafficking, and state building.

13.     While with NAAC, I developed programs for women's leadership and youth inter-ethnic reconciliation, successfully secured over $11 million in earmarked Congressional funding for these projects, and worked with the United States Agency for International Development ("USAID") to implement and oversee these projects.

14.     Also while Executive Director of NAAC, I partnered with the Public International Law and Policy Group ("PILG") to deliver the first draft of Kosovo's Constitution.  I also supported PILG in the negotiation and drafting of the Ohrid Peace Agreement, which brought an end to armed hostilities in Macedonia.

15.     In this role I also partnered with Harvard University's Project on Justice in Times of Transition and played a key role in bringing together all of the Kosovar leaders and key international players for the first ever conference to discuss Kosovo's transition to self-rule and statehood using South Africa as one of the models.

16.     While serving as NAAC's Executive Director, I also partnered with the Center for International and Strategic Studies to organize conferences on Montenegro's minority issues and on Kosovo's independence.

17.     My duties with NAAC also included fundraising, creating action plans and budgets, and overseeing the financial operations needed to support these plans. It required me to work closely with the Board of Directors and to leverage limited assets to their highest and best use.  I also ensured and supervised required reporting

and was actively involved in public relations events, which resulted in appearances on CNN, Fox News, and several other local and national media outlets. I prepared regular reports for the Board of Trustees, including annual reports with audited financials. My Executive Director position also involved significant and extensive travel and meetings with many high-level dignitaries, including Presidents and Prime Ministers of several Balkan nations as well as other high-level officials, including U.S. Ambassadors, European representatives, civil society representatives, members of the media, and other stakeholders.

18.     In 2006, I transitioned my role in NAAC to become the Advisor to the Prime Minister of the newly formed country of Kosovo and became part of Kosovo's first-ever official delegation to the United Nations. In this role, I interfaced with government ministers and civil society leaders.

19.     I knew from the outset that the position of Advisor to Kosovo's Prime Minister was only intended to be temporary and, after about a year, I was presented with an opportunity to enter the construction and demolition industry. From 2007 to present, I was actively involved in leading construction and demolition companies in Brooklyn, New York, including Benjamin Maintenance and Windham Restoration prior to joining MER as its CEO.

20.     As the leader of companies involved in demolition and construction, I led companies from the start-up phase through stabilization and promoted success by actively seeking and winning both small routine projects and large value projects.

21.     I managed budgets, hired and terminated personnel, developed the business strategy, reported to investors, engaged in client relations, and managed all

aspects of demolition, including environmental remediation (lead paint, asbestos, petroleum, and other substances) and historic preservation.

## II.
## The Debtors' Business and Events Leading to the Chapter 11 Filings

22.    Globally, the shipbreaking industry has a terrible reputation—over 90% of all ships are ultimately sent to the breaking yards of the Indian subcontinent, where deaths and serious injuries from workplace accidents, including fires and explosions, are a daily occurrence.  At those yards, hazardous waste is regularly dumped directly onto the land and into the sea, and child labor and complete disrespect for workers' health, safety, training, and environmental protection are the normal method of operation.

23.    MER was formed in 2014 to disrupt this industry by simultaneously setting new, higher standards in health, safety, environmental responsibility, and employing technological innovation and modern business principles to drive greater efficiency.  MER is guided by its "Not a Drop" principle—meaning that not a drop of pollution should harm the environment from the work that MER performs, and not a drop of blood should be spilled in the performance of that work.

24.    The effort to develop such an entity in the ship recycling space attracted significant positive attention.  Admiral Richard Camacho (United States Navy, Ret.) and Kona Bay Strategies soon joined MER's Advisory Board, as did Governor and former EPA Administrator Christine Todd Whitman and the Whitman Strategy Group.

A.    **History of Puerto Rico Operations**

25.    In 2015, MER created its wholly owned subsidiary, MER PR, to operate in Puerto Rico.  MER was drawn to Puerto Rico because of the facilities that were

available at the abandoned Roosevelt Roads Naval Station, and because of the promise of tax and other investment incentives.

26.      After visiting the Roosevelt Roads site on Puerto Rico's eastern shore, MER was informed by the Puerto Rico Industrial Development Corporation ("PRIDCO"), an agency of the Puerto Rican government, that the Roosevelt Roads site was not yet available due to other entanglements, but that the former StarKist Tuna factory in Mayagüez, on the west side of the island, was available and suitable for use.

27.      For MER's operational plan to be optimally employed, MER needed principally two types of property in proximity to one another: (a) a deep water pier at which vessels could be docked and partly dismantled, and (b) a parcel of land where the "canoe" of the vessel (the lower part of the vessel that was still structurally stable and watertight after the upper level modules had been removed and recycled) could be brought out of the water.  Such a parcel could take several different forms, including, for example, a graving dock, a marine railway, or a roller slip/ramp.

28.      The StarKist factory site was in deplorable condition:  Many buildings had collapsed and been looted of anything of value, vermin were everywhere, debris was strewn everywhere, and part of the property was bisected by an improper piping system erected by a neighboring property so that it could have access to the pier. However, the property was zoned for heavy industry and had what appeared to be a strongly built pier that was primarily already covered in concrete and had more than sufficient space for MER's operational needs.  Even though it did not have a portion of the property that was already equipped to take canoes out of the water, it had a suitable site for a roller slip to be constructed.

29.     After expending time and effort to conduct a feasibility study on using the Mayagüez site, in September 2015 MER executed a lease with the government of Puerto Rico for the property, purchased and moved a fleet of heavy equipment from the mainland to Puerto Rico, made public announcements of its opening at Mayagüez, purchased two vessels for recycling, hired over 50 people, began work to clean up the Mayagüez facility, and retained an architecture and engineering firm to develop plans for the civil construction work that MER PR would require (including construction of the roller slip).  MER also entered into leases for residential properties for executives who moved to Puerto Rico from the mainland to oversee operations.

**B.     The Mayagüez Debacle**

30.     After expending approximately $1.5 million of MER's funds to completely clean the Mayagüez site of all debris and properly secure the remaining decrepit buildings from further collapse, the Mayor of Mayagüez (who until this time declined to meet with MER despite numerous requests) directed MER to stop work at the facility on the basis of trespass and, once the work was stopped, directed that MER PR's "patente" (a license to operate within the city limits) be suspended on the basis that MER PR was not, at such time, performing any business relating to ship recycling (due, of course, to his own directive that MER PR stop work).

31.     The thrust of the Mayor's argument was that the lease for the property was invalid because it included property owned by the city of Mayagüez that the territorial government of Puerto Rico had no legal authority to lease to the Debtors, or to anyone else.

32.     Upon investigation and review with PRIDCO, it turned out that the Mayor was entirely correct concerning the property ownership. The government of Puerto Rico had leased property to MER that was in fact owned by the city of Mayagüez. Frustratingly, the city-owned parcel was the most critical piece of the entire property for MER's operations, because it included the only viable site for the roller slip, the entranceway to the facility, and a substantial portion of the largest intact building on site. Without access to and full and unfettered use of the city-owned parcel, continuing work at Mayagüez was operationally impossible.

33.     Very significant efforts were made by MER and PRIDCO to convince the city of Mayagüez to lease its parcel to MER, which would have provided a significant local employment opportunity and would have dramatically improved the local economy. The Mayor's office, however, believed that the property should be developed as a cruise ship port and advised that there was no interest in developing the property for industrial use.

34.     Because the city-owned parcel could not be obtained, MER advised the Puerto Rico Governor's office that it was leaving the island and was going to sue Puerto Rico for fraud. The Governor became personally involved, and his office intervened immediately, making entreaties to MER to stay on the island and to move its operation to Roosevelt Roads, which the Governor's office advised was by this point at least partially free from the prior entanglements and would soon be free of all entanglements.

35.     The Roosevelt Roads facility did have two major infrastructure improvements to real estate that would promote MER's operational success—a deep

water pier and a graving dock large enough to recycle an aircraft carrier.  Accordingly, this appeared to be a reasonably good option.  Unfortunately, however, the Local Redevelopment Authority for Roosevelt Roads ("LRA"), the Puerto Rico government agency that owns and operates the facility, had re-zoned the industrial part of the base that included the main deep water pier (Pier 3) for tourism-related purposes, because of the belief that the area should be repurposed as a cruise ship port. Additionally, the graving dock area was still entangled under an existing lease that was set to terminate in November 2015.

36.    MER advised that it could not operate at Roosevelt Roads without being able both to utilize the pier and have an area where vessels could be removed from the water, preferably the graving dock.  The Governor's office and the Secretary of Economic Development promised MER that if it proceeded to open, develop infrastructure, hire personnel, and commence operations, then one of two things would happen:

(i)    MER would be moved to the graving dock property and could operate from that site; or

(ii)    MER could continue at the Pier 3 site because "no one would move MER out" if it was a business that was employing a significant number of people.

37.    In exchange, MER agreed to:

(a)    Negotiate a commercial lease with the LRA, on a short-term basis with respect to Pier 3 and on a long-term basis with regard to the industrial buildings;

(b)    Seriously consider alternative sites to the graving dock, both within and outside of the Roosevelt Roads property;

(c)     Assist the government's public relations efforts by allowing the government to hold a ceremony at which it could be announced that it had finally (about a dozen years after the Navy's departure) put the facility to productive use with numerous new jobs (ultimately 274 positions) created in the most economically deprived part of the island; and

(d)     Begin recycling operations—despite not yet having a place to put the canoes pulled from the water—on the condition that such a site would be provided by the Puerto Rican government before the actual need to remove canoes arose or, if the timing on such site were delayed, the canoes could be safely "stored" on site without significant adverse impact on operations.

## C.     Historical Conditions Adverse to Conducting Business in Puerto Rico

38.     MER faced numerous obstacles and unfair challenges at Roosevelt Roads.  Among many other items:

(a)     MER's operations were held up for approximately 4 months because the Puerto Rican government claimed it had no methodology by which to give MER use permits for the buildings that it had leased at Roosevelt Roads.  It was explained that the buildings were built by the Navy, which did not need to obtain construction permits, and the government of Puerto Rico had no experience in issuing new permits for existing buildings as no such permits had been issued since the island was a colony of the Kingdom of Spain and under a different legal regime.

144250208.5

Although MER questioned why it needed such permits when other companies (and the LRA itself) had the ability to utilize other Navy-built buildings without obtaining use permits, MER never received a direct answer. It seemed that the reason was tied to the fact that the other companies were owned by Puerto Ricans while MER was not. I hosted several meetings on behalf of MER at which a representative from the Governor's office (or the Governor himself) was present, together with the decision makers from each and every governmental agency that had any potential ability to solve the problem, and it took nearly four months of haranguing in order to finally get use permits issued.

(b)    With respect to the environmental permit to use the pier, Puerto Rico's environmental agency, the Department of Natural and Environmental Resources ("DNER"), restricted MER to the number of vessels that could be located at the pier at any one time, without providing any reason or opportunity for consultation. The DNER appears to have utilized a process diagram from MER's operational documents as the basis for restricting the number of vessels, but refused to meet with MER directly to address the reason for the restriction. In order to operate effectively, MER was required to hire counsel to interface with the DNER and to obtain a modification to the restricted permit, which should never have been restricted in the first place.

144250208.5

13

(c)    The LRA made no secret of its open hostility to MER's presence at the facility.

a.    The Executive Director continuously demanded that MER pay for things that were not MER's contractual obligation to pay (such as the DNER permit obtained by the LRA), and made it clear that the only reason that MER was at the facility was because the Governor had ordered the Executive Director to allow MER to establish itself there.

b.    The LRA accused MER of stealing water and went so far as to shut off and chain the water system that provided firefighting protection at Pier 3 in order to wrest MER into paying for infrastructure improvements that solely benefited the LRA not MER.

c.    The LRA also prevented MER from obtaining fiberoptic service at its facility, insisting that MER obtain satellite service at exorbitant pricing from a small local provider with minimal service bandwidth who was a friend of the Executive Director of the LRA.

d.    Electric power supply was irregular at best due to problems with supply carried over the utility pole system, which the LRA declined to upgrade unless MER paid for an upgrade of the entire facility.

e.    Despite receiving frequent complaints regarding the poor road conditions from the main entrance to the MER facility, the LRA refused to repair the roads and instead required speed bumps to be

installed all around the facility, apparently in an effort to impede MER's production.

f.  When MER complained about a low-hanging electric distribution line that restricted MER's operations and offered to pay to have the line moved higher, the LRA refused to move the line unless MER also paid for other infrastructure improvements at the facility that would solely benefit the LRA.

g.  When MER inquired about installing solar panels to provide consistent (and green renewable) power, the Executive Director stated that MER could do so only if it used her husband's solar panel company.  MER installed a demonstration model micro-windmill to provide electric power to the access gate, but LRA refused to authorize the permitting for the windmill, and so the unit needed to be disconnected and the gate operations reverted to manual opening and closing.

h.  When MER inquired about leasing additional adjacent space, the Executive Director refused to consider it unless the Governor's office directed her to do so.

i.  With full knowledge that MER sought either the graving dock or an adjacent parcel to remove canoes from the water, the LRA leased the property adjacent to MER on both sides to third parties for negligible amounts (denying MER the opportunity to lease these same parcels).  The tenant who occupied the graving dock was a

friend of the LRA Executive Director and was provided with what can only be termed a "sweetheart deal" to have a long-term lease on that property despite the fact that it was not being developed at all. MER was informed that if it wanted the property, it would need to sublease it from the friend of the Executive Director.

j.   The LRA refused to secure the facility, improperly allowing (and even encouraging) the general public to access industrial areas adjacent to MER's facility, which led to massive problems with theft and vandalism.

39.     Despite the open hostility, MER attempted to improve its relationship with and support the LRA by providing free meeting room space for multiple LRA meetings at Roosevelt Roads, providing free air conditioning and electric power to the LRA at Roosevelt Roads, making numerous other infrastructure improvements that benefited the LRA and/or the facility generally, and donating firefighting equipment and other tools, equipment and services to help the LRA.

**D.     MER Invests in Its Puerto Rico Operation**

40.     Despite these hardships, MER lived up to its part of the bargain.  MER invested in excess of $15 million in the Puerto Rico operation and at its height had nearly 300 people employed full time at Roosevelt Roads, of whom fewer than 10 were from off-island.  MER was the only private success story at Roosevelt Roads and was featured at presentations made by the LRA in New York and Washington to show that the government of Puerto Rico was making positive strides forward.   MER

donated significant amounts of equipment and services to local charities and other good causes and received substantial positive press for its work in Puerto Rico.

41.     Additionally, MER applied for—and received—recognition by the European Union ("EU") as having processes that met or exceeded the requirements of the 2013 European Union Ship Recycling Regulations, the most stringent health, safety and environmental standards in the world, which set MER apart as the only non-European yard that was qualified to recycle European-owned or operated ships. Indeed, MER was the first company in the world to qualify under these standards "the hard way"—by actually having its manuals, processes, licenses, and permits audited by the EU.  (All the qualified European yards were admitted onto the EU's "white list" after being nominated by their host countries without any actual auditing or other review having yet been performed.)

42.     As a result, MER gained positive worldwide press attention and its representatives were interviewed by the maritime press on several occasions.  It also won accolades and other honors for its work and its industry-changing methodologies.  MER was invited to give keynote addresses at the industry's largest gathering of ship recycling interests (in Singapore) and at the Ethical Corporation Congress (in San Diego), and was asked to consult with the governments of Scotland, England, and Belgium concerning the creation of qualifying ship recycling facilities in those countries.  Additionally, private interest groups in nineteen different countries on four continents consulted with MER to develop modern, safe, and green ship recycling facilities in those countries.  Several of these consultations are still ongoing.

43.     In Puerto Rico, MER designed, developed and prototyped a new technology called the "Waistcoat," a pollution control device that captures pollution (for later disposal) that would otherwise enter the water from normal ship recycling activities.  MER's Waistcoat was so revolutionary in design that it was awarded a U.S. patent in only a few months.

44.     MER also successfully demonstrated the complete recycling of a coastal freighter (the ATLANTIC VII) in a safe and entirely environmentally sound manner. In that case, MER was able to reduce the large floating vessel to a canoe that was small enough to be lifted out of the water by MER's barge-mounted heavy-lift crane.  MER also commenced recycling operations on two other vessels.

**E.     Continued Efforts to Obtain Suitable Property for Canoe Removal**

45.     Prior to the November 2016 election, the Puerto Rico Governor's office made various attempts to find a solution for MER to bring vessel canoes out of the water.

46.     MER was offered property at the southern port city of Ponce, but the piers that were offered had all been condemned, the cost of repairs was prohibitive, and the time to obtain the needed permits would have taken years.

47.     MER was also offered property near the southwest corner of Puerto Rico, in Guayanilla, but the pier was merely a fuel pier and could not be utilized for MER's ship recycling purposes.

48.     Proposed sites in Aguadilla and Arecibo, on the northwest corner of the island, were similarly inappropriate or were being set aside by the local mayors in the hope that these would become future facilities for the arrival of cruise ships.

49.     Another property offered on Puerto Rico's eastern side, Yabucoa, was a former graving dock site and appeared to finally be a workable solution.  However, as soon as MER expressed interest in that property, the government leased so much land on both sides of it to third parties that the remaining property was insufficient to meet MER's space requirements.  Similar to Roosevelt Roads, the government's apparent intent behind the sale of these adjacent properties was to require MER to sublease parcels from tenants who had highly-placed friends in government and had received "sweetheart deals" on these properties.

50.     Meanwhile, the previously promised graving dock in Roosevelt Roads had been effectively given away by the LRA for a nominal fee to a friend of the LRA Executive Director, rendering this property unavailable, unless subleased from such friend at corrupt rates.

51.     In April 2016, MER proposed that it be provided with the adjoining properties to Pier 3 in Roosevelt Roads, Bulkhead Charlie and Torpedo Bay, neither of which had been in use since the Navy vacated the property a dozen years before. MER spent considerable time, effort, and funding to develop plans for the use of these otherwise abandoned properties and presented these plans to the prior government on multiple occasions from mid-April through early November 2016.

52.     Despite these numerous presentations and requests to lease these adjoining properties, the only response from the government came in early November 2016, during a phone call in which I was advised that the government fully expected it would lose the upcoming election and so could not enter into new leases because any such leases would be viewed as suspect by the (anticipated) new

19

incoming government and could be subject to being voided as improper.   The government intimated that it was doing MER a favor by not leasing these properties so close to the election and advised that MER might be better off with the new government anyway, because of its pro-business stance and the fact that MER was "shovel-ready."   Thus, MER was told to try its luck with the new government in January 2017 when it was installed.

**F.   New Government Refuses to Honor Commitment to MER**

53.   As had been predicted, the election turned against the party that was in power and a new government was installed.   MER attempted to reach out to the transition team and secured meetings during the interim between November 2016 and January 2017.   During meetings with the new Governor's staff, including the incoming Secretary of the Economy, MER warned them that if it could not obtain the property it needed in order to remove canoes from the water, MER would need to stop operations and terminate large numbers of personnel.   MER indicated that it intended to hold the government of Puerto Rico accountable for the promises that had been made to find a solution for MER's property needs.   Despite assurances from the incoming government that a solution would be found to keep MER working and personnel employed, no solution was ever provided.

54.   The new government did not appoint a new head of the LRA for nearly two months, and the person who was finally appointed had never held a post higher than receptionist and clearly had been tasked with something that was far too difficult for her.   Although she met with MER and was receptive to its proposal to acquire the

abandoned Bulkhead Charlie and Torpedo Bay properties, she never committed to provide these or any other properties and soon stopped taking MER's telephone calls.

55.     MER wrote to the LRA and the Secretary of the Economy on numerous occasions, advising that without the property the government had promised, MER would need to stop operations and lay off workers.  MER carried through on that threat by the end of 2016, and laid off approximately 50 workers.  MER advised those workers that the reason for their layoffs was because MER was unable to continue working without the property that their government had promised.  The workers indicated that they would contact their representatives to press for a political solution.

56.     Meanwhile, MER pressed the local mayors for Ceiba and Naguabo (cities with representatives on the LRA's board of directors) for assistance.  The mayor of Ceiba had been a supporter of MER all along, and he responded that the LRA was appointing a new executive director.

57.     The LRA's new executive director advised that he believed it would be better for MER to be located at another property and, together with the Secretary of the Economy, suggested properties at Mayagüez, Ponce, Guayanilla, Aguadilla, Arecibo, and Yabucoa.  Despite MER's explanation that none of these sites would work, the new executive director insisted that MER explore them again.  However, as MER re-explored the proposed sites, the executive director was changed again. Thereafter, the Secretary of the Economy was mired in a corruption scandal and was also changed out for a new Secretary of the Economy.

58.     After investing approximately $15 million in the Puerto Rican venture, training hundreds of personnel, and hiring nearly 300 workers, MER still had no solution and was forced to threaten to stop operations and terminate all personnel.

59.     Meanwhile, the coastal freighter LONE STAR had been successfully dismantled and was brought to a canoe condition.  However, because the estimated remaining weight of the LONE STAR exceeded the capacity of MER's heavy lift crane, MER asked the LRA to provide at least a temporary permit to allow MER to bring the vessel ashore at Torpedo Bay and dismantle it there or, alternatively, at the boat ramp area at Bulkhead Charlie.  Multiple requests for such permit were made, but no timely response was ever issued by the LRA (see below concerning the sinking of the LONE STAR).

60.     MER never received any response to its request for the additional promised property and by the end of January 2017, MER terminated the employment of nearly all personnel—approximately 250 persons—leaving only a small number of persons employed to sufficiently secure and care for the facility and the vessels.  MER advised the laid-off personnel that the reason for their termination was because MER could not proceed until the government fulfilled its promise to provide the property needed to remove vessels from the water.  Again, the personnel responded that they understood that the fault was with their government and promised to contact their mayors, legislators, and the Governor.

61.     From February through April 2017, MER continued to press the LRA and the Puerto Rican government for a solution, suggesting throughout that the best option was for MER to acquire the abandoned properties next door—Bulkhead

Charlie and Torpedo Bay.  However, MER never received any response from either the LRA or from the government of Puerto Rico concerning these properties.

62.     MER continued to complain to the LRA about an increasing number of incursions onto its property that had resulted in thefts.  To prevent further incursions from the "columpio" (a makeshift swing over the water suspended from a tree near the east side of MER's property), MER installed significant amounts of barbed wire and other anti-personnel devices, and worked with the LRA's maintenance manager on site to install road blocks to prevent people from driving up to the facility at that location and accessing MER's property from the water.

63.     MER also attempted to work with its security firm, Anointed Security (the same security company utilized by the Puerto Rican government to provide security at Roosevelt Roads), to improve the quality of the security being provided at the facility, which was already under its guard system 24 hours a day.

64.     Unfortunately, none of these efforts was successful at preventing incursions onto MER's property that resulted in thefts and vandalism.

65.     Despite multiple further attempts to engage the government of Puerto Rico, MER only achieved a few meetings and never received any assurances that the government's promise to provide a suitable property would be kept.  The government appeared entirely unconcerned about the broken promise to MER, the loss of 250 plus jobs, or MER's investment of $15 million.

**G.     May Day Protests Lead to Sinking of LONE STAR Canoe**

66.     As May Day 2017 approached, protests against the newly installed Governor's austerity measures increased dramatically, such that over 100,000 people

protested in the streets of San Juan, and the Governor ordered law enforcement to fire tear gas at the protesters, resulting in numerous injuries.

67.     As the weekend approached, the Governor's office issued a warning to all emergency response officers throughout the island that lightly defended government installations would likely be the subjects of retaliatory vandalism.  The LRA's Roosevelt Roads facility was specifically named as a likely target, but no notice to any of the tenants at Roosevelt Roads was ever provided.

68.     That weekend, on Saturday, April 29, 2017, MER personnel worked at the facility from the morning until approximately noon.  As usual, maintenance work on the vessels was carried out, including checking to see if they were floating at their usual marks.  After confirming that they were, the MER team departed, noting nothing amiss.

69.     After the MER team departed, Anointed Security posted only one security guard at MER's gate, a person who had never previously been a guard at MER's facility.

70.     On the evening of April 30, 2017, MER's Director of Operations, Phil Fitzgerald, received a communication from the LRA's maintenance manager that oil had been seen in the water near MER's facility and that the Coast Guard was on its way to investigate.  Mr. Fitzgerald rushed to the facility to investigate and was later joined by the Coast Guard investigators.  As they moved down the pier, Mr. Fitzgerald saw immediately that the LONE STAR canoe was missing and that an oil slick was on the surface of the water where the vessel had been.  He made immediate arrangements to have Sea Tow deploy additional harbor boom to contain the

potential spread of any oil that might have escaped and immediately enacted MER's

emergency action plan.[2]

### H.    Spill Response Successful

71.    As soon as these matters were underway, Mr. Fitzgerald called me.  I

was not on the island at the time but made immediate plans to arrive on a flight that

left the next morning.  I informed MER's General Counsel, Lawrence ("Larry") Kahn,

who immediately called the insurance broker.  The broker re-directed Mr. Kahn to

speak with Safe Harbor Insurance, who promptly responded to the spill by deploying

an Oil Spill Response Agency that began handling of the spill cleanup.

72.    Due to the precautions MER took that exceeded regulatory

requirements, all the oil that had been spilled from the LONE STAR was completely

contained within a secondary oil boom perimeter and was promptly cleaned up.  Mr.

Kahn dealt directly with the media response and worked together with Mr. Fitzgerald

to coordinate with the Coast Guard and other regulators.

---

[2] At this time, MER owed Anointed Security a relatively small amount of money that had not yet been paid.  MER withheld these funds as it investigated the sinking of the LONE STAR.  During its investigation, MER found, among other things, that Anointed Security was not performing its duties, and at the time the vessel sank, two mooring lines were strained to the point where they both snapped.  The sound of these heavy lines snapping would have been louder than a gunshot, and there is no reason why the guard should not have heard the noise.  Yet no report on the sinking of the LONE STAR was ever issued by Anointed Security, who instead reflected in its security log book that nothing was amiss.  Anointed Security sued MER to recover its unpaid fees, and MER counterclaimed for the loss of the LONE STAR and related claims.  Although Anointed Security never pursued the suit and its claim was eventually dismissed with prejudice, the Court noted that MER's counterclaim was still viable if MER wished to pursue it.

73.     After exhaustive investigation, government regulators concluded that the spill had been entirely cleaned up with no negative impact on the environment.

74.     MER conducted an investigation of its own as to the cause of the sinking and determined that the only explanation for the sinking of the LONE STAR was sabotage and vandalism.

**I.      MER's Insurers Abandon MER in Violation of Insurance Policies**

75.     After the initial oil spill had been cleaned up, it was observed that the LONE STAR was continuing to release small amounts of oil.   The Coast Guard authorized the response to be downgraded to passive monitoring and cleanup, but given the proximity of the wreck to protected species of coral, it indicated that a directive to completely abate the pollution threat would be necessary if oil continued to leak.   Because a complete abatement would likely require the vessel to be removed from the sea floor, MER dutifully reported this to its insurers and sought wreck removal coverage.

76.     The insurance brokers advised that despite having a policy in place with Travelers, no actual written policy had ever been delivered on the correct form. The first policy that was delivered was defective and was rejected.   A second policy was delivered, was likewise defective, and was also rejected.   Though multiple

requests were made for Travelers to deliver a policy on the correct form, no correct version of a written policy was ever delivered.[3]

77.    Despite Travelers' failure to timely deliver a correct written policy, there was absolutely no dispute that a policy was in place at the time of the sinking of the LONE STAR that had been paid for by MER, and that the relevant policy contained two specific clauses providing wreck removal coverage that had been negotiated and agreed upon.  The first clause provided for "Voluntary Wreck Removal" coverage, meaning that Travelers would pay for any wreck removal simply upon request by MER.  This coverage had a limit of liability of $1 million.  The second clause provided for "Compulsory Wreck Removal" coverage, meaning that Travelers would pay for wreck removal if it was required by a governmental entity with jurisdiction to require the removal.  The compulsory wreck removal clause had a limit of $5 million.

78.    Travelers also sold MER a so-called Bumbershoot (umbrella) policy, which provided MER with a $9 million limit of liability above the Travelers' primary policy.

79.    MER requested that Travelers provide coverage for the Voluntary Wreck Removal so that the LONE STAR could be removed and warned Travelers that based on discussions with the Coast Guard and local governmental authorities, the matter was likely to become a compulsory wreck removal case in the near future.

---

[3] MER sued Travelers in Puerto Rico rooted *inter alia* on the basis of wrongful denial of coverage, which included an allegation that Travelers had never delivered a written policy.  After suing, and several months after the policy expired, MER eventually received a written policy from Travelers, which once again did not reflect the correct policy language.

80.    Travelers issued a reservation of rights letter, quoting language that was definitely not in MER's policy.  MER rejected this letter, arguing that the quoted language could not form the basis of a good faith reservation of rights on the premise that the language was not in the policy (a policy which Travelers had still not delivered in written form).

81.    Travelers modified its reservation of rights letter, again quoting language that was not in the policy, and MER objected again on the same basis.

82.    MER also contacted Starr Indemnity & Liability Company ("Starr"), which provided pollution insurance coverage to MER and had paid for pollution cleanup during the initial phase.  Given the issues with Travelers, MER examined the pollution policy with Starr and noted that it included a clause that required Starr to provide wreck removal when required to abate pollution.

83.    When MER requested that Starr provide coverage under this clause, Starr initially denied that such clause existed in its policy.  After citing the language, Starr agreed the clause was in the policy but issued a reservation of rights letter claiming that there was no coverage under the policy based on allegations that MER failed to maintain the LONE STAR in a seaworthy condition.

84.    MER rejected Starr's reservation of rights letter because (a) MER had kept the LONE STAR in a seaworthy condition; and (b) Starr had already agreed that coverage was proper because it had paid for the oil spill cleanup under that policy.  Thus, Starr could not now claim that there was no coverage simply because it did not want to pay for wreck removal.

85.     MER made numerous efforts to advise both Starr and Travelers that the government would soon issue orders requiring the removal of the wreck and that if there was to be any hope of maintaining control over the wreck removal process, MER would need to negotiate a contract with a salvage company and start the work promptly.

86.     Because both policies provided coverage, and because it was not MER's job to determine which of the two insurers needed to cover the cost of the wreck removal (or if both needed to share the cost), MER made numerous efforts to get Starr and Travelers to work together.  MER also warned that hurricane season was about to begin and once it started, costs and the danger of exacerbated damage would increase.  Despite such efforts by MER, both insurers completely refused to cooperate and neither agreed to remove the wreck.

**J.      Wreck Removal Becomes Compulsory**

87.     As predicted, the government orders to remove the wreck came soon thereafter.  The first order was issued by the Coast Guard on July 7, 2017.

88.     The Coast Guard's jurisdiction concerning wrecks is limited—it has the ability to issue orders requiring the abatement of pollution from wrecks that are emitting pollution, but it cannot issue orders to remove wrecks *per se* unless those wrecks are interfering with navigation in a navigable waterway.

89.     Because the LONE STAR sank at the pier, it was not interfering with navigation in a manner that would enable the Coast Guard to issue an order mandating removal.  In its July 7, 2017 Order, however, the Coast Guard required that

the pollution threat from the LONE STAR be abated, and it was clear that the only practical way to comply with such an abatement order was to remove the wreck.

90.    MER promptly notified its insurers, and Travelers modified its reservation of rights letter to state that Travelers would not provide coverage but was continuing its investigation.  Travelers' letter stated that because the Coast Guard order only required pollution abatement and not wreck removal, MER needed to look to Starr to provide the wreck removal coverage.  Travelers advised MER to act as a prudent uninsured.

91.    MER responded to Travelers advising that its decision was wrong, at least to the extent that MER absolutely had at least one million dollars in voluntary wreck removal coverage.  However, MER never received any further response from Travelers, although it claimed to be continuing to investigate coverage.[4]

92.    In fact, Travelers never provided <u>any</u> coverage to MER despite its failure to provide any valid reason for denying coverage.  Accordingly, MER sued Travelers in Federal District Court in Puerto Rico on the basis of, among other things, bad faith and wrongful denial of coverage.

93.    Similarly, Starr indicated in its reservation of rights letter that it would not provide coverage either, also telling MER to act as a prudent uninsured.

---

[4] MER was advised by the insurance brokers that if an insurer claims in a reservation of rights letter to be continuing an investigation, the insurer must provide monthly updates to the insured as to the status of its investigation, and failure to do so constitutes a denial of coverage.  Because Travelers **never** issued any updates concerning its "investigation," it thus denied coverage to MER.

94.    MER responded that Starr was certainly obligated to provide coverage based on the specific provision of the policy that required it to perform wreck removal to abate pollution.  MER also informed Starr that if it did not provide coverage, then MER would need to inform the Coast Guard that based on its insurers' denial of coverage, MER did not have the necessary resources to comply with the government's order.  As a result, MER would need to inform the Coast Guard to call on MER's Certificate of Financial Responsibility ("COFR").[5]

95.    Starr's initial response was that it did not care if the Coast Guard called on MER's COFR, until Starr realized that it had issued the COFR.  This meant that if Starr denied coverage under the policy (either through a denial of coverage or a reservation of rights), then Starr would need to pay for the very same cleanup activity, but at a substantially higher cost, under the COFR.

96.    Starr, realizing that it was going to have to pay for the wreck removal, was furious, and appointed the law firm of Nicoletti Hornig & Sweeney to act as its purported claims handler in the matter.

97.    Because Starr had appointed counsel, MER inquired whether it should employ its own counsel to protect MER's interests.  Starr responded that the Nicoletti firm had been appointed as a claims handler to represent the combined interests of MER and Starr, that MER was not entitled to its own counsel, and that Starr would not

_____

[5] A COFR is a financial guarantee for pollution cleanup that is required by Coast Guard regulations.  It is not "insurance," but is instead a guarantee which provides that the guarantor will pay for pollution cleanup.  If the Coast Guard calls on the guarantor under the COFR, then it is because the cleanup activity has become federalized, in which case the cost of cleanup tends to skyrocket.

pay for any of the other ordinary expenses, such as for MER's own surveyor. Effectively, Starr denied coverage with respect to MER's claim, including but not limited to sue and labor under the Starr policy.

98.     Starr also threatened MER that if MER did not fully cooperate with the Nicoletti firm, then Starr would revoke coverage and leave MER to fend for itself with regard to non-compliance with the Coast Guard order.  MER explained again that it would fully cooperate with the Nicoletti firm, but that Starr's threatening statements were unhelpful to any sort of collaborative relationship.  Moreover, if Starr pulled its insurance coverage the matter would be federalized, and Starr would still be required to pay for wreck removal (at elevated costs) under the COFR.  As such, MER stated that it hoped to work with Starr (and the Nicoletti firm) to resolve the matter and that by maintaining coverage the overall cost of the project could be kept down.  Despite MER's attempts to encourage a positive working relationship, Starr's representatives became increasingly combative.

99.     Shortly thereafter, on July 28, 2017, the Puerto Rico DNER issued an order directing MER to remove the LONE STAR wreck.  Although the order specifically required wreck removal, it did not cite any reason why the wreck needed to be removed.  MER promptly turned over copies of this order to both Starr and Travelers.

100.     Travelers responded that because the order was issued by a government environmental agency, it related to pollution and should be covered by Starr.

101.     MER responded that Traveler's determination was incorrect for multiple reasons, including that (a) the order said nothing about pollution; and

(b) the DNER's jurisdiction also included the profitable use of waterfront areas on the island, including but not limited to Pier 3 where LONE STAR had sunk, and that the vessel was therefore impeding the agency's pecuniary interests.  Travelers never responded except to indicate that it was maintaining its position that Starr was responsible and Travelers owed no contribution.

**K.      Starr and Nicoletti Firm Force MER to Breach Coast Guard Order**

102.    The first required action under the Coast Guard order was to provide a plan by which the pollution threat would be abated.

103.    Prior to the issuance of the Coast Guard order, MER had reached out to three salvage companies to provide pollution abatement plans, and was thus already prepared to respond to this aspect of the Coast Guard order.  MER only received responses from two of the salvage companies (Resolve and Ardent) and shared those plans with Starr and Travelers.  MER recommended that the Resolve plan be advanced, because Resolve's plan was both significantly cheaper and could also be executed sooner.  MER again pointed to the need to act swiftly because of the impact of hurricane season.

104.    As the deadline to submit the plan to the Coast Guard approached, MER asked for permission to advance the Resolve plan, but Starr and Travelers both failed to respond.  To avoid defaulting on the Coast Guard order, MER timely submitted the Resolve plan to the Coast Guard.

105.    After the Resolve plan was submitted, a dive was conducted on behalf of interests represented by the Coast Guard, which revealed that the area in which the LONE STAR was located was proximate to protected species of coral.  The Coast

Guard accordingly issued a further directive that MER adjust the plan to address the protection of coral. MER received responses from both Ardent and Resolve that modified their respective plans to protect the coral, and again the plan from Resolve was both cheaper and faster to execute and complete. MER submitted Resolve's modified plan to the Coast Guard in a timely manner and the Coast Guard approved it, issuing a further order that MER enter into an agreement by a date certain which it would carry out the amended plan. The Coast Guard's order afforded MER plenty of time to negotiate a contract to carry out the approved abatement plan.

106.   MER asked Resolve to provide its standard terms for the work to be done and asked for help from Starr and the Nicoletti firm to negotiate with Resolve. Because MER received no response from either Starr or the Nicoletti firm, MER negotiated with Resolve to perform some of the work itself in order to reduce the wreck removal costs. Specifically, MER offered to perform all of the heavy lifts of the pieces of the LONE STAR that would be cut by Resolve. Because MER had a heavy lift crane already on location, there would be no need for Resolve to either (a) bring in its own separate heavy lift crane (which would have dramatically increased the cost of the wreck removal); or (b) shift the attachment on the crane that it was bringing from the guillotine (used to break the vessel into several smaller sections) to the hook (to lift the vessel sections) and back again, which would not only have added to the cost, but more importantly, would have dramatically increased the time to perform the work. Resolve readily agreed to work with MER in this way because it made sense economically, and because Resolve would not need to dedicate as many resources to Puerto Rico that could be more profitably employed elsewhere.

107.    As MER was negotiating with Resolve, Travelers asked permission to send a representative to evaluate the possibility of using its own preferred contractor to perform the work.  MER immediately responded that Travelers was welcome to send its representative, hoping this was a sign that Travelers had a change of heart and would finally provide coverage and take over the operation.

108.    When Travelers' representative arrived, MER cooperated and afforded the representative every reasonable courtesy.  Unfortunately, the representative provided an estimate for the pollution abatement work that was scheduled to cost multiples of what Ardent had bid and would have taken far longer to accomplish.  Also, the company proposing to do the work was a small Florida-based company that did not have the very strong reputation that both Resolve and Ardent enjoyed.  As such, this proposal was, by far and by any measure, the worst that had been received.

109.    As the August 24, 2017 deadline approached, MER forwarded the contract with Resolve that had been negotiated thus far to the Nicoletti firm, again asking for assistance in negotiation.  At this point, the Nicoletti firm finally responded, saying that it had two contractors who wished to evaluate the work to be done.  The Nicoletti firm indicated that it did not want to use Resolve or Ardent because it believed that MER was too close to these entities.  MER rejected the notion that it had an alliance with either Resolve or Ardent and invited the Nicoletti firm to send the other contractors down to Puerto Rico to conduct their investigations, but noted the upcoming deadline.  Ultimately, one contractor advised that it was uninterested in either conducting an investigation or submitting a bid.

110.    The Nicoletti firm advised that the other contractor proposed a plan by which the wreck was not to be raised but the oil that was trapped within the vessel would be removed.[6]  The Nicoletti firm said that to develop this plan, it would need additional time.  MER advised the Nicoletti firm that such a proposal would likely not be approved by the Coast Guard because (a) the Coast Guard order specifically stated that only the approved plan (which required the wreck to be removed) could be utilized; and (b) the Coast Guard had already indicated that it would not extend the deadline because of concerns that 2017 would be a very active hurricane season and it wanted the wreck removed before any hurricanes developed.  MER also indicated that leaving the wreck in place would not solve the issue with the DNER and that the Nicoletti firm, as the claims handler, needed to assist in having Travelers pay for the removal of the wreck at the very least.  The Nicoletti firm stated it would pursue the alternative proposal anyway, and MER advised that it would cooperate.

111.    The Nicoletti firm thereafter sought permission from the Coast Guard to extend the deadline and to propose an alternative plan that would not result in the wreck being removed.  In its communications with the Coast Guard, the Nicoletti firm did not copy MER even though it was required to do so.  While this failure initially appeared to have been inadvertent, it soon proved to be part of the Nicoletti firm's

---

[6] MER learned at a later date that this plan was actually invented by the Nicoletti firm as a way to avoid the wreck removal and to leave MER alone to deal with Travelers and face the Coast Guard and the DNER without the benefit of insurance.  Even though the Nicoletti firm was appointed by Starr to represent MER's interests, its actions promoted only Starr's interests and were directly contrary to MER's interests.

pattern of undermining MER in ways that covertly benefited Starr and simultaneously harmed MER.

112.    In its response to the Nicoletti firm, the Coast Guard copied MER and rejected the request for exactly the reasons MER anticipated—the proposed new plan to extract the oil was not the plan that was ordered, and the additional time was not allowed because of concerns about hurricanes.

113.    Thereafter, the Nicoletti firm threatened that if MER did not put up a bond to secure Starr for $3 million (even though the cost of the operation was expected to only be around $2 million), then Starr would deem MER to be "uncooperative" and would deny coverage.

114.    MER attempted to secure a $3 million bond, but because MER was a new company, the bond had to be secured by $3 million in cash. Securing a bond was thus pointless, both because (a) there was no benefit to buying a bond if it was going to be secured with an equivalent amount in cash; and (b) MER did not have $3 million in cash in any event.

115.    The Nicoletti firm then demanded other security from MER for $3 million. The only security MER could offer was a mortgage on the crane barge SEVEN POLARIS, which MER estimated to be worth up to $5 million. Although MER protested that it should not be forced to insure its multi-billion dollar insurance company against its own interests in the policy it had purchased, the Nicoletti firm stated that Starr would not proceed unless it had the mortgage, and that it would find MER to be uncooperative if the security was not provided.

116.    MER pushed the Nicoletti firm multiple times to negotiate the contract with Resolve.  The Nicoletti firm initially insisted that MER could not perform any services directly for Resolve because it did not want to have Resolve charge a fee to Starr merely for processing MER's invoices for MER's own work.  MER pointed out that Resolve's proposed contract provided that there would be no markup for MER's invoices—these would simply be paid by Resolve and set for reimbursement by Starr. MER also provided written confirmation from Resolve that it would not mark up MER's invoices.  The Nicoletti firm nevertheless required MER to enter into a separate contract with Starr to provide goods and services.[7]

117.    The Nicoletti firm also argued that if it did not direct MER's work, then Starr would be exposed to cost over-runs.  The Nicoletti firm demanded that if MER wanted Starr's help with this matter, MER would have to make sacrifices in its Goods and Services contract with Starr and would need to perform work at or below MER's own cost.  MER produced to Starr its standard rates sheet, which MER pointed out had been approved by the Delaware Bankruptcy Court handling the Paragon bankruptcy, the proceeding through which MER had acquired certain vessels.  The Nicoletti firm dramatically reduced MER's rates, with no explanation as to why it was reducing the rates.  The rate reductions demanded by the Nicoletti firm appeared to be entirely arbitrary, and whenever MER questioned any rate or responded that it

---

[7] MER later learned that the Nicoletti firm was acting yet again against MER's interests despite being MER's appointed counsel.  In fact, the real reason the Nicoletti firm did not allow MER to bill (and be paid by) Resolve was because the Nicoletti firm was recommending to Starr that it not pay MER for these services at all, which would be an economic weapon to use against MER.

could not perform the work for the rate the Nicoletti firm wanted, the Nicoletti firm would threaten to state that MER was being uncooperative and was jeopardizing coverage.  MER explained that it did not understand why Starr was seeking to reduce the rates, because MER had assumed that Starr was merely going to pursue Travelers for reimbursement and wrongful denial of coverage on MER's behalf.  MER later learned, however, that the Nicoletti firm (despite being MER's counsel) was trying to cause MER to experience severe economic distress from performing this work and that there was no intent to seek recovery from Travelers.

118.    In another attempt to protect Starr at MER's expense, the Nicoletti firm demanded that MER cap its total fees on the project at $300,000 regardless of what MER actually expended—essentially requiring MER to fund a multi-billion dollar insurance company despite having a valid claim under its insurance policy with that company.  Again, the Nicoletti firm's intent was a double protection for Starr—(a) the Nicoletti firm was trying to put MER in economic distress by forcing it to operate below its own cost and never intended to have MER be paid at all; and (b) even to the extent that MER could require Starr to pay for the goods and services MER was providing, Starr's total exposure would be limited to a relatively small amount.

119.    Despite being MER's counsel, the Nicoletti firm demanded that MER draft its own Goods and Services contract with Starr, apparently because the firm was trying to save Starr money on legal fees instead of representing MER's interests.  Even after the contract was drafted and all the terms were exactly as the Nicoletti firm demanded, it refused to have Starr execute the agreement until there was also a mortgage on SEVEN POLARIS.

120.     In yet another effort to save Starr money at MER's expense, the Nicoletti firm required that MER draft the mortgage documents.

121.     After drafting the mortgage documents, MER informed the Nicoletti firm that the SEVEN POLARIS was no longer registered with its flag state (Vanuatu) and that the LONE STAR's registration with Vanuatu had also lapsed.  Because the mortgage was purely for Starr's benefit, MER expected that Starr would pay to have the vessel reinstated onto the registry so that the mortgage could be recorded there or, alternatively, with whatever flag state Starr wished.

122.     When the Nicoletti firm learned that the registration on SEVEN POLARIS had lapsed, and that Vanuatu would not re-register SEVEN POLARIS unless LONE STAR was also reinstated, it reported this to Resolve for what appeared to be no reason other than to embarrass MER.  The only reason the Nicoletti firm was in possession of this information was because it was representing MER as counsel.

123.     The other MER executives and I became furious when we learned about this, and MER's in-house counsel demanded an explanation from the Nicoletti firm as to why we should not immediately lodge an ethics complaint.   John Nicoletti responded, "We will no longer deal with you. . . . It is not called the New York Ethics board.  If you need the proper name and address there is always google [sic]."

124.     Despite MER doing exactly as Starr required (i.e., as demanded by the Nicoletti firm), the Nicoletti firm ultimately refused to negotiate with Resolve at all, and instead required MER to stand as a messenger between Resolve and the Nicoletti firm.

125.    On the day that the contract needed to be executed to comply with the Coast Guard order, Hurricane Harvey was bearing down on Houston and was being described as potentially the largest and most devastating hurricane to ever strike the United States.    Through extreme efforts, MER persuaded Resolve to honor its commitment, even though it could earn far more money on the use of its equipment if it were deployed to Houston instead.

126.    For the first time in the entire process, and on the afternoon of the Coast Guard deadline date, the Nicoletti firm sent a long list of changes that it demanded in the Resolve contract.    MER worked with Resolve through the changes and Resolve agreed to some of the changes and modified and rejected others.

127.    In the ensuing back-and-forth exchanges, Resolve responded promptly, while responses from the Nicoletti firm took substantially longer.    Each time MER asked the Nicoletti firm to act more expeditiously, the Nicoletti firm would threaten to label MER as uncooperative, pull coverage, and leave MER exposed to potential criminal liability to the Coast Guard.

128.    As midnight (Atlantic Time Zone) approached, the contract was nowhere near execution, and MER insisted that the Nicoletti firm wrap things up.    It did not.    The Nicoletti firm dragged things out for several more hours, refusing to give on a point that made absolutely no sense.    It ultimately broke off negotiations, saying that it approved the entire contract except for one clause.    Resolve refused to give up on the wording of that clause and said that there was no contract if the clause was not included.    Despite MER's pleas with the Nicoletti firm to agree to the contract, the firm responded that MER needed to act as a prudent uninsured in signing the contract with

the clause included, and that it would not recommend that Starr honor the contract or pay for the work to be done if the clause was included.

129.     Additionally, the Nicoletti firm refused to issue Resolve a standard Letter of Undertaking ("LOU") document that had no unusual language.  Resolve advised that it would not mobilize until it was in possession of the original LOU.  The Nicoletti firm refused to issue the LOU until the mortgage was recorded.  Based on a promise from the Nicoletti firm that it would promptly release the original LOU to Resolve, MER convinced Resolve to agree to mobilize if MER assumed the risk of signing the contract despite the clause that the Nicoletti firm refused to approve.  MER did this knowing that any further delay risked Resolve quitting the process and not having any salvage equipment or personnel available because Houston was about to be hammered by Hurricane Harvey, and all available equipment and personnel (except for those promised by Resolve to work on the LONE STAR) were already being dispatched to Houston.

130.     In addition, although both the mortgage document and the Goods and Services contract had exactly the wording (and rates) that the Nicoletti firm required, the Nicoletti firm refused to assent to the terms of either document until the mortgage was recorded with Vanuatu (which, of course, was impossible given the late hour and the fact that the wording of the mortgage document itself needed to be approved by a Vanuatu-licensed attorney).

131.     As Starr and the Nicoletti firm both refused to assist in complying with the Coast Guard's order, MER executed the agreement with Resolve (which only provided for the underwater work, but none of the heavy lifts required by the Coast

Guard-approved plan) and long after the deadline had passed wrote to the Coast

Guard as follows:

> "With apologies for the tardiness of this communication, I write to advise that MER's underwriter has issued MER a nuanced and specially conditioned authorization to execute an agreement with Resolve that covers a substantial portion of the plan that Coast Guard approved.  The remaining portion of the approved plan that is not covered by the agreement with Resolve remains subject to discussions with MER's underwriter which are currently scheduled to be concluded on or before Monday August 28.  In the meanwhile, however, I can confirm that an agreement was signed with Resolve and that Resolve is now mobilizing."

132.    Thanks entirely to the good working relationship that MER had

established with the Coast Guard, the Coast Guard issued a communication the next

morning confirming that MER had substantially complied with the order and

requiring that the remaining items be resolved expeditiously.

133.    Starr thereafter required MER to pay the fees to reinstate the LONE

STAR and the SEVEN POLARIS with Vanuatu, but reluctantly agreed to pay the actual

mortgage recording fee.  Meanwhile, Hurricane Harvey struck Houston as a major

hurricane causing unprecedented damage, and hurricanes Irma, Jose, Katia, Lee, and

Maria had all formed.

**L.     Hurricanes Irma and Maria Impact Puerto Rico**

134.    As Hurricane Irma approached Puerto Rico, it was moving along a track

that was directly between Resolve's equipment in Florida and the Bahamas and

MER's facility in Puerto Rico.  Accordingly, Resolve asked MER to secure authority

from the Coast Guard to delay mobilization so as not to risk life or property.  MER

immediately made this request and the Coast Guard, which was already responding

to the impact of Hurricane Maria on the US Virgin Islands, immediately approved the request.

135.    At the same time, on September 5, 2017, the LRA issued an order to MER immediately to remove the LONE STAR wreck, citing concerns of damage to LRA facilities in the face of the likely impact of Hurricane Irma.  While the LRA's order, on its face, underscored both the LRA's complete lack of understanding as to what was required to remove the wreck (despite having already been briefed by MER) and the fact that its own failure to provide MER with a lease to remove the LONE STAR while it was still afloat had resulted in this very problem, it was nonetheless the compulsory order of a governmental entity.  MER therefore notified its insurers of the order, which notice was ignored by both Starr and Travelers.

136.    Immediately in the wake of Hurricane Irma, Hurricane Maria followed the same path over the U.S. Virgin Islands after destroying every single structure on the island of Dominica.  Resolve and MER notified the Coast Guard that mobilization would be further delayed by Hurricane Maria.

137.    On September 18, 2017, the LRA issued another order, again demanding the immediate removal of the LONE STAR wreck.  This order was also promptly forwarded to MER's insurers, who again provided no response.

138.    The impact of Hurricane Maria on Puerto Rico is well known.  The entire island's electrical system collapsed, leaving the entire island in darkness.  The tap water system was also disabled and all communications systems were destroyed.  Roads, which were already in poor condition, were blocked and/or further damaged.  Bridges and dams were destroyed.  There was no ability to get people or supplies to

or from Puerto Rico for weeks.  Despite being located within the area where Hurricane Maria made landfall, MER's preparations for the hurricane proved to be largely successful.  Unfortunately, MER still suffered very significant damage from being hit head-on by a Category 5 hurricane—part of Pier 3 suffered impact damage where the SEVEN POLARIS came into contact with it; another vessel, the CARIBBEAN PROVIDER experienced a significant hole; and several of MER's cranes suffered catastrophic damage.  One of MER's warehouses lost part of its roof and the contents within were impacted by water.  The back half of a second warehouse suffered severe structural damage, and MER's offices were completely flooded under several feet of seawater.

139.    If MER had been provided with the property that had been promised to it by the Puerto Rican government, the damage to Pier 3, SEVEN POLARIS, and the CARIBBEAN PROVIDER would not have occurred.

140.    MER's personnel who had remained on the island all reported that they and their families were safe and that their homes had sustained little or no serious damage.  They were suffering from lack of power and water but had made their way back to the facility and reported the vessels were all afloat and in reasonably good condition.  The Coast Guard reported the same within a few hours.

141.    MER actively participated in the recovery effort by donating equipment and services for the benefit of the island and its people and using Pier 3 for the public good.  It is fortunate that MER made these and other donations in good conscience and without any expectation of receiving anything in return, because MER could not then be disappointed by the lack of any positive response.  Sadly, these actions did

not engender any goodwill with the LRA, which now stands to receive significant infrastructure investment from FEMA as a direct result of MER's actions.

**M.      Starr Wrongfully Interferes with MER's Prospective Business Advantage**

142.    Following Hurricane Maria, MER was contacted by Falvey Yacht Insurance Co. ("Falvey") to submit a proposal by which MER would accept a very large number of storm-damaged yachts from the Caribbean that Falvey had insured.  Falvey sought to transport these yachts en masse to MER's Pier 3 facility, and MER would work with Falvey's surveyors to determine which yachts needed to be scrapped and which yachts could be sold for salvage (following cleanup).

143.    MER traveled to Falvey's offices in Rhode Island and submitted a proposal that met with the approval of Falvey's senior management.  An agreement to begin this work on Falvey's behalf—which according to Falvey would lead to similar agreements for other yacht insurers who had also been negatively impacted by the hurricanes—was about to be reached when MER received a call from the insurance brokers advising that they had heard about the potential deal with Falvey, that Falvey was beneficially owned by Starr, and that Starr was going to prohibit Falvey from providing this business opportunity to MER.

144.    Shortly thereafter, during a telephone discussion with Falvey, MER was advised that Falvey would take a "different approach," one which Falvey had previously discussed with MER and had noted was considerably less favorable because it was more expensive, time consuming, and difficult to manage than MER's option.  The Falvey representative said that he regretted the choice that had been made not to proceed with MER, because he felt strongly that MER was the better

option in every respect, but that his hands were tied by decision makers "well above his pay grade."

145.    It was clear from this conversation that Starr had intervened to deny this business opportunity to MER, with the intent of causing MER economic loss.

**N.     LONE STAR Wreck Removal**

146.    MER and Resolve actively worked with the Coast Guard to secure the reopening of Ensenada Honda so Resolve's vessels could arrive to start the LONE STAR wreck removal.

147.    Because the Nicoletti firm wrongfully withheld the LOU (see above), Resolve threatened to depart.  The Nicoletti firm ultimately turned the LOU over to Resolve months after it was due after Resolve threatened to (a) report Starr to the Coast Guard as actively interfering in the wreck removal (knowing that the Coast Guard would federalize the matter as a result and call on the COFR); and (b) walk away from the contract and sue Starr for cancellation damages.

148.    Although MER provided goods and services as required by the Goods and Services contract Starr refused to pay.  MER later learned that the Nicoletti firm had instructed Starr not to pay in order to cause MER economic distress.  Starr raised several specious arguments concerning charges, and after many weeks of work without pay, MER told Starr that it was in breach and that MER would stop Resolve's work, sue for damages, and direct the Coast Guard to federalize the matter.  This prompted a meeting in New York at Starr's offices at which Starr agreed to pay MER a substantially reduced amount and agreed further that all future payments would be made in a timely manner.

149.     Starr's promise to make future payments under the Goods and Services contract proved to be a worthless lie.  Starr never made another payment to MER under the Goods and Services contract, despite the fact that MER had performed its work completely and had incurred well over the maximum $300,000 that could be charged against Starr.  Although Starr never provided any reason for refusing to pay, MER learned that the Nicoletti firm had instructed Starr to withhold payment.  The Nicoletti firm likewise never provided any reason for non-payment, even though its own surveyor approved the charges presented by MER.

150.     MER met with Starr again at Starr's offices in New York to request the outstanding payments but was met with hostility by representatives of Starr and the Nicoletti firm.  At this meeting, Starr agreed to pay at least part of the outstanding amount owed to MER under the Goods and Services contract, however, Starr again failed to make any such payment and offered no explanation as to its refusal.

**O.     Starr Sues MER in Bad Faith**

151.     During the LONE STAR wreck removal, Starr had multiple experts overseeing the project by taking notes, taking samples, and directing the process and procedures.  These experts were appointed by Starr (via the Nicoletti firm) and were supposed to have been for the mutual benefit of Starr and MER.  Indeed, when MER made a request pursuant to the sue and labor clauses of the insurance contract to have its own representatives present, Starr denied such request on the basis that Starr's interests and MER's interests were aligned.  However, the entire time Starr's experts were on-site, they kept their operations secret from MER's employees, officers, and directors, and refused to disclose what they were doing and why, despite

multiple requests.  Because it was clear that Starr's experts were not working for MER's benefit in any way, MER appointed a surveyor firm, Atlantic Marine Associates ("AMA"), to represent its own interests.  MER made this appointment considering that if Starr and the Nicoletti firm were in fact working against MER's interests, then MER would eventually be able to recover the cost of AMA as a sue and labor expense.

152.    The mortgage agreement between MER and Starr specifically provided that within 60 days of the last piece of the LONE STAR being removed from the water, Starr must determine whether it had a good faith basis for bringing an action against MER for unseaworthiness.  If it did not, then the mortgage would be cancelled, and Starr would have no further rights against MER.

153.    During conversations between AMA and Starr's experts, Starr's experts conceded that there was "no smoking gun" indicating any wrongdoing on MER's part, and Starr's expert surveyor concluded jointly with AMA that the sole reason for the sinking of the LONE STAR was that the sea valve had been opened.  The only evidence as to how the valve was opened was that it had been an act of vandalism or sabotage.

154.    MER, AMA, and Starr's experts agreed that AMA would write up a factual report summarizing the wreck removal activities. As AMA was preparing to do so, MER received a copy of the summons and complaint that Starr had filed in the Southern District of New York seeking to void the policy on grounds that Starr had already waived and seeking damages against MER, which it sought to enforce against the SEVEN POLARIS pursuant to the mortgage.  Given the entire lack of any good faith basis for its suit, the action was clearly brought in bad faith.

155.    Throughout the lawsuit, Starr and the Nicoletti firm have engaged in abusive and dilatory tactics that are aimed to harass MER and cause pecuniary harm, knowing full well that there is no good faith case that can be made against MER as alleged in the suit.

156.    Moreover, the Nicoletti firm has been handling the lawsuit on Starr's behalf even though there is a clear conflict of interest—the Nicoletti firm was initially retained as a claims handler in this matter and the attorneys can thus be called as fact witnesses in the matter.   In addition, MER recently conducted a lien search and learned that Starr's mortgage is not recorded against the SEVEN POLARIS.

## P.    MER Sues Travelers

157.    MER sued Travelers in Puerto Rico District Court for wrongful denial of coverage, among other claims.

158.    Throughout the litigation in Puerto Rico, Travelers engaged in abusive and dilatory tactics aimed at delaying the proceedings and eventually prevailed upon the court, which was experiencing a heavy criminal docket, to issue an indefinite stay of the action.

159.    The action in Puerto Rico is now indefinitely stayed.

## Q.    Insurers Have Pushed MER into Bankruptcy

160.    The question of who should have paid for the wreck removal of the LONE STAR was an issue that should have been decided between Starr and Travelers. However, those two insurance companies either could not or would not (despite many efforts by MER and the brokers) discuss the matter with each other.   Instead,

both companies worked to avoid their payment obligations and as a result, MER—
who clearly had coverage—was caught in the crossfire.

161.    MER was illegally and improperly forced to secure its insurance
company against its own claim under its insurance policy, MER was not paid for the
work it performed for Starr, and MER ultimately had to expend hundreds of
thousands of dollars on legal fees in defending itself against the action brought in bad
faith by Starr and in pursuing Travelers, which wrongfully denied coverage.  As MER
was drawn deeper and deeper into these litigations, it found itself unable to fund
operations and has – step by step – reduced everything to the point where it is now
barely able to operate.

162.    Moreover, whereas MER initially withheld rent payments to force the
LRA to discuss obtaining the additional property that had been promised, MER now
no longer has those funds available to pay this rent to the LRA.  As such, the LRA
issued notice to MER stating that it will not allow MER to proceed at Pier 3 and
requesting that MER vacate the property.

**R.    Current Status of MER's Operations**

163.    Due to the above circumstances, MER currently employs only three
persons operating solely out of its Puerto Rico location on Roosevelt Roads, and an
accountant who operates at a location in Puerto Rico outside of Roosevelt Roads.

164.    As of December 31, 2018, MER's balance sheet showed total assets of
$6,094,099.47 and total liabilities of $7,197,363.10.  MER's net income for 2018 was
$1,767,075.74.

### III.
### MER's Corporate Structure

**A.      MER' Corporate Structure**

165.      MER was formed in 2014 as a New Jersey limited liability company with its principal place of business located in Mountain Lakes, New Jersey.  MER PR is the wholly-owned, single-member subsidiary of MER, and is a Puerto Rico limited liability company located in Ceiba, Puerto Rico.

166.      MER in turn is owned by non-debtors Maritime Equities LLC ("ME"), with a 96.8% ownership interest and Lawrence Kahn, with a 3.2% ownership interest.

**B.      MER's Prepetition Capital Structure**

167.      MER's pre-petition capital structure is straightforward.  It has only outstanding trade payables in the approximate total amount of $1–2 million; a series of loans owed to ME in the approximate total amount of $16 million and disputed litigation claims asserted by Starr and Travelers.  As noted previously, the mortgage on the vessel SEVEN POLARIS in favor of Starr is no longer recorded.  Prior to the filing, the Debtors obtained an additional loan from ME, in exchange for which the Debtors were required to grant a security interest in favor of ME on all assets.  ME has also agreed to provide the Debtors with post-petition financing.

### IV.
### Proposed Strategy to Emerge from Chapter 11

168.      MER has developed multiple significant business opportunities in the interim that are shovel-ready, or nearly so.  For example, MER has several consulting opportunities for shipyards seeking to make their facilities EU compliant.  MER also

has several significant ship-recycling prospects, including large units that will involve many months of productive work. MER is additionally in discussions with a number of cruise lines to provide environmental, refitting, and repair services.

169.    In addition, MER has developed a strategic plan that, when combined with the above opportunities, should allow MER to become profitable. Under this plan, MER intends to re-employ approximately 300 people to assist in operations. MER has also investigated significant investment opportunities that will allow it to develop much-needed infrastructure improvements to the benefit of both the people of Puerto Rico and MER.

170.    For MER to return to functionality, it needs to utilize the bankruptcy process to pay its local Puerto Rican creditors and to litigate in a consolidated manner the various claims it has against Travelers and Starr. Additionally, MER hopes to work out an arrangement with the government of Puerto Rico as part of the bankruptcy process by which MER will be permitted to finally lease appropriate property on reasonable terms.

171.    In furtherance of this process, MER intends to (a) sell certain assets within the next 90 days to raise cash and (b) receive DIP financing so that it can proceed to develop its business and fund to conclusion the litigations needed to obtain just results with regard to the matters involving the sinking of the LONE STAR. The asset sale and DIP financing will in turn put MER in a position to reorganize and return to productive and profitable activity. Within the first 30 days, MER will need to complete a proposal for consulting services but expects that this proposal will be accepted, and that MER can engage in the consulting service within 30–60 days

following approval.  Once MER has a suitable site to return to operations (which MER hopes will be resolved within the context of this chapter 11 proceeding within approximately 60–90 days), it will obtain the required financing to proceed with the infrastructure development that will be needed and will commence with the development by obtaining the required permits and proceeding to commence the construction.

**V.**
**Evidentiary Support for First Day Motions**

172.    At this time, the Debtors' business operations have been substantially scaled back.  In addition, the commencement of these cases is being made on an urgent basis.  As a result, the Debtors have not yet filed several typical first day motions.

173.    The Debtors are in the process of finalizing several first day motions (collectively, the "First Day Motions") seeking relief that MER believes is necessary to enable it efficiently to administer its estate with minimal disruption and loss of value during the Chapter 11 Cases.  The Debtors respectfully request that the Court grant the requested relief in each of the First Day Motions to maximize the value of MER's estate.  I believe that the relief requested in the First Day Motions is necessary to allow MER to operate with minimal disruption during the pendency of the Chapter 11 Cases.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:        May 10, 2019
              Mountain Lakes, New Jersey

                                                        */s/ Martin Vulaj*
                                                        Martin Vulaj
                                                        Chief Executive Officer

144250208.5                                                                        54